UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JENNIFER DAILEY,                                        CIVIL NO. 08-4775 (RHK/JSM)

              Plaintiff,

v.                                                      REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

JANIE S. MAYERON, United States Magistrate Judge

       Defendant has denied Plaintiff Jennifer Dailey's application for supplemental

security income (SSI) under the Social Security Act, 42 U.S.C. § 423.  Plaintiff brings

this action seeking review of the denial of benefits.  The matter is now before the Court

on cross-motions for summary judgment.  Plaintiff is represented by Paul Onkka, Esq.

Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.  This

Court has jurisdiction of the matter pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. §

1383(c), and it is properly before the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 72(b).  For reasons

discussed below, it is recommended that plaintiff's motion for summary judgment

[Docket No. 8] be DENIED; and defendant's motion for summary judgment [Docket No.

14] be GRANTED.

## I.    PROCEDURAL BACKGROUND

       Plaintiff protectively filed her application for supplemental security income on July

21, 2004, alleging disability since July 21, 2004.  (Tr. 52).  Plaintiff's application was

denied initially, and upon reconsideration. (Tr. 48, 42). Plaintiff requested a hearing before an Administrative Law Judge. (Tr. 41). A hearing was held before ALJ Larry Meuwissen on July 18, 2007. (Tr. 298-352). On December 10, 2007, the ALJ issued a decision unfavorable to plaintiff. (Tr. 12-23). The Social Security Administration Appeals Council denied a request for further review. (Tr. 6-9). The denial of review made the ALJ's findings final. 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 416.1481.

Plaintiff has sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c). [Docket No. 1]. The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 8] and defendant's Motion for Summary Judgment [Docket No. 14].

## II.    PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." 42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least

12 months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

### A. Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383 (c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The first step asks if the claimant is currently engaged in substantial gainful employment. If so, the claimant is not disabled. If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities. If not, the claimant is not disabled. If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled. The fourth step asks if the claimant's impairments prevent [him] from doing past relevant work. If the claimant can perform past relevant work, [he] is not disabled. The fifth step involves the question of whether the claimant's impairments prevent [him] from doing other work. If so, the claimant is disabled.

Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994).

### B. Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-

404.982, 416.1467-416.1492. The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within 60 days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.     Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and to consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of plaintiff's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1885 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d

934, 939 (8th Cir. 1994). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1999 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." Id. In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some

other substantial, gainful activity.  Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

## III.    DECISION UNDER REVIEW

After performing the five-step analysis, the ALJ concluded that plaintiff was not disabled or entitled to supplemental security income under section 1614(a)(3)(A) of the Social Security Act.  The ALJ stated that he made the following findings of fact and conclusions of law based on the entire record:

1.      The claimant has not engaged in substantial gainful activity since July 21, 2004, the application date (20 CFR 416.920(b) and 416.971 et seq.).

2.      The claimant has the following severe impairments: obesity; mild mental retardation; and major depressive disorder (20 CFR 416.820(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      The claimant has the residual functional capacity to perform medium work, generally described as lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing and/or walking 6 hours of an 8 hour day, and sitting 6 hours of an 8 hour day, simple, 2-to-3 step instructions and tasks, brief and superficial contacts with coworkers and the public, and only minimal changes in the work environment.

5.      The claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

6.      The claimant has no past relevant work (20 CFR 416.965).

7.      The claimant was born on April 16, 1986 and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

11.     The claimant has not been under a disability, as defined in the Social Security Act, since July 21, 2004, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-23).

## IV.    ISSUES UNDER REVIEW

On appeal, plaintiff contends that the record does not support the ALJ's determination of her residual functional capacity.  Specifically, plaintiff argued: (1) the ALJ improperly placed great weight on the opinion of the medical consultant examination in making the RFC determination; and (2) the ALJ did not adequately consider the non-medical evidence that plaintiff was not able to perform full-time employment without frequent absences.  Pl. Mem., p. 10 [Docket No. 9].

## V.    THE RECORD

### A.    Background

On July 21, 2004 plaintiff applied for benefits.  (Tr. 52-54).  In support of this application, plaintiff completed a Disability Report for the SSA (Tr. 113-118), and Disability Report Appeal forms.  (Tr. 83-96, 119-123).  Plaintiff stated that mild cognitive impairment and depression limited her ability to work.  (Tr. 113).  According to plaintiff, these conditions limited her because she needed a job coach to help with training and modification of job tasks, and she needed help with communication between her and her supervisors and co-workers.  (Tr. 114).

### B. Medical Records[1]

On July 29, 2004, plaintiff saw Dr. Trevor Busch for concerns of depression. (Tr. 231). Plaintiff reported decreased energy and poor sleeping and concentration. (Tr. 231). Dr. Busch noted that plaintiff was planning on moving out on her own, and that she had a family support system to help her with stress. (Tr. 231). Dr. Busch started plaintiff on Fluoxetine[2] for the depression. (Tr. 231).

On August 31, 2004, plaintiff saw Dr. Busch for a physical. (Tr. 229). Plaintiff reported a history of depression, acne, and irritable bowel-type symptoms; she was taking Fluoxetine for the depression. (Tr. 229). She was diagnosed as a healthy female with stable depression, and continued on her current medication. (Tr. 230).

On October 21, 2004, Dr. R. Owen Nelson, Ph.D. performed an assessment of plaintiff's records after she filed for benefits. (Tr. 243). Dr. Nelson found insufficient evidence to assess the medical portion of the disability determination. (Tr. 243). Dr. Nelson noted that plaintiff's school records indicated impairment, and the medical evidence of record indicated that her depression was stable. (Tr. 255). Dr. Nelson also observed that plaintiff did not return the activities of daily living questionnaire. (Tr. 255).

On December 22, 2004 and January 14, 2005, Kristy Mavis, Ph.D., LP performed a psychological evaluation of plaintiff after she was referred for testing by the Scott County Human Services Developmental Disabilities Unit. (Tr. 263). At the time, plaintiff

---

[1] As plaintiff's challenge to the ALJ's denial of benefits is focused solely on her cognitive impairment and depression, this Court has confined its review of medical records to those records that bear on these issues.

[2] Fluoxetine (Prozac) is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. Fluoxetine is in a class of medications called selective serotonin reuptake inhibitors (SSRIs).
See http://www.nlm.nih.gov/medlineplus/druginfo.

was a twelfth-grade student at the Minnesota River Valley Special Education Cooperative, and was in adult foster care in Shakopee. (Tr. 263). Plaintiff denied any medical concerns, but reported a history of depressive symptoms for which she was treated with Prozac. (Tr. 264). Plaintiff stated that Prozac was not helpful and she no longer took it, that she had recently begun psychiatric treatment with Dr. Kennedy at the Scott County Mental Health Center, and that she had started a trial of Cymbalta.[3] (Tr. 264). Plaintiff reported receiving counseling from a social worker at her school. (Tr. 264).

Dr. Mavis observed that plaintiff was cooperative, and put forth a good effort on cognitive testing. (Tr. 264). Plaintiff appeared sad and was tearful at times, and described difficulty sleeping and frequent worrying. (Tr. 264). Plaintiff acknowledged some problems with her peers at school, and getting into trouble at school for failing to follow rules. (Tr. 264). Plaintiff stated that she wanted to be involved in more activities. (Tr. 264).

To assess plaintiff's intellectual ability, plaintiff completed the WAIS-III (Wechsler Adult Intelligence Scale, Third Edition). (Tr. 264). Plaintiff's full scale score was in the range of 73-80, which was in the borderline range and at the 5th percentile of cognitive ability. (Tr. 264). Her verbal comprehension score, which measured word knowledge, verbal reasoning and language ability, was in the range of 72-82 and was classified as borderline. (Tr. 264). Her perceptual organization score, which measured visual spatial problem solving skills and nonverbal reasoning ability, was in the range of 83-95 and

---

[3] Cymbalta (duloxetine) is used to treat depression and generalized anxiety disorder. Duloxetine is in a class of medications called selective serotonin and norepinephrine reuptake inhibitors (SNRIs).
See http://www.nlm.nih.gov/medlineplus/druginfo.

was classified as low average to average. (Tr. 264). Plaintiff's score on the working memory factor, which measured short-term auditory memory and processing skills, was in the range of 58-69 and was classified as mildly mentally impaired. (Tr. 264). Plaintiff's processing speed score, which measured her ability to complete repetitive, routine, visual-motor tasks quickly, was in the range of 82-97 and was classified as low average to average. (Tr. 264).

Generally, plaintiff received higher scores on tasks that involved nonverbal problem-solving or manipulation of objects than on language-based tasks that required a verbal response. (Tr. 264). Plaintiff's nonverbal abilities were noted to be a relative strength when compared to her verbal reasoning and language ability, and when compared to her short-term memory. (Tr. 264). Plaintiff's working memory score represented an area of weakness, indicating that she would have more difficulty with tasks involving memory and concentration. (Tr. 265).

Plaintiff's adaptive functioning was assessed using the Vineland Adaptive Behavior Scales, Interview Edition. (Tr. 265). Plaintiff's foster care provider served as the informant for the interview. (Tr. 265). Plaintiff's adaptive behavior composite score was measured at 47, which was at an age equivalent of eight years, three months, and classified as low. (Tr. 265). Plaintiff's communication domain score, which measured receptive, expressive, and written language, was rated at 37, which was at an age equivalent of seven years, eight months, and classified as low. (Tr. 265). Her socialization domain score, which measured her adaptive behavior in relationships, leisure time and coping skills, was rated at 47, which was at an age equivalent of five years, five months and classified as low. (Tr. 265). Plaintiff's daily living skills domain

score, which measured personal, domestic and community skills, was measured at 70, which was at an age equivalent of eleven years, nine months and classified as moderately low. (Tr. 265). Dr. Mavis noted that this score was relatively high when compared to her communication and socialization scores, suggesting that plaintiff had a relative strength in daily living skills for someone of her overall level of adaptive behavior. (Tr. 265).

Dr. Mavis reported plaintiff's DSM-IV diagnosis as follows:

Axis I:      Major Depressive Disorder, Recurrent, Moderate.

Axis II:     Mild Mental Retardation.

Axis III:    None reported.

Axis IV:    Peer problems at school.

Axis V:     GAF = 55.[4]

(Tr. 266).

In summary, Dr. Mavis opined that plaintiff's performance on cognitive testing yielded scores in the Mildly Mentally Impaired to Low Average range. (Tr. 266). Plaintiff exhibited a relative strength in visual-spatial, nonverbal problem solving and relative weaknesses in verbally-based tasks and working memory. (Tr. 266). Although her full scale score was in the borderline range, her deficits in adaptive functioning indicated that she met the criteria for a diagnosis of Mild Mental Retardation. (Tr. 266). Her

---

[4]      The GAF scale is used to assess an individual's overall level of functioning. Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision)). The lower the score, the more serious the individual's symptoms. See Id. GAF scores of 51 to 60 reflect "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, p. 34 (4th ed. 2000 Revision).

overall level of adaptive functioning was in the low range and at an age equivalent of eight years, three months. (Tr. 266). Her communication and socialization skills were also classified as low, and her daily living skills were moderately low and represented an area of relative strength for plaintiff. (Tr. 266). The test results suggested that plaintiff would require ongoing training in independent living skills and would require extensive assistance with occupational functioning. (Tr. 266).

Dr. Mavis found that plaintiff's mood symptoms were consistent with a diagnosis of Major Depressive Disorder, and recommended that she continue to receive psychiatric treatment. (Tr. 266). Dr. Mavis also recommended that plaintiff continue with counseling, and that she could also benefit from participating in a social skills training group or from increased participation in other supervised, structured activities with peers of a similar developmental level. (Tr. 267).

On February 3, 2005, plaintiff was seen by Dr. R. J. Kennedy of the Scott County Mental Health Center. (Tr. 262). Dr. Kennedy observed that plaintiff was depressed and moody, and had stopped taking Prozac. (Tr. 262). Plaintiff reported that school had improved over the past couple of months. (Tr. 262). Dr. Kennedy noted that plaintiff was shy and bashful, with fair coping skills and fairly good concentration. (Tr. 262).

Dr. Kennedy determined plaintiff's DSM-IV diagnosis as follows:

Axis I:          MDD[5] with mixed ____.[6]

Axis II:         def

---

[5]      Major Depressive Disorder.

[6]      This last word is indecipherable.

Axis III:    none active

Axis IV:    mild/moderate

Axis V:     60/70.[7]

(Tr. 262).  Dr. Kennedy prescribed Cymbalta for plaintiff.  (Tr. 262).

On March 1, 2005, plaintiff met with Dr. Kennedy again.  (Tr. 261).  Plaintiff stated that everyone said she was better and happier, and Dr. Kenney noted that she had better focus and that her sleep and energy were good.  (Tr. 261).  He indicated that plaintiff had good hygiene, fairly good memory and insight, better concentration, orientation and judgment, and no perceptual difficulties.  (Tr. 261).  Dr. Kennedy also noted that plaintiff's depression was much better.  (Tr. 261).

On April 12, 2005, Dr. Kennedy noted that plaintiff stated that everyone around her said she was happier.  (Tr. 260).  Plaintiff was compliant with her medications, and still had occasional mood swings, but acknowledged feeling better.  (Tr. 260).  Plaintiff's sleep and energy were fair; she had good hygiene, fair memory and insight, fairly stable mood and affect, fair concentration and orientation, and no perceptual difficulties.  (Tr. 260).  Dr. Kennedy stated that plaintiff's depression was better, and added Trazodone[8] to plaintiff's medications.  (Tr. 260).

On May 31, 2005, Dr. Kennedy indicated that plaintiff's mood had been good and that she had been sleeping better.  (Tr. 259).  Plaintiff had good hygiene, fairly good

---

[7]    A GAF score of 61 – 70 indicates an individual has some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functions pretty well, and has some meaningful interpersonal relationships.  Diagnostic and Statistical Manual of Mental Disorders, p. 34 (4th ed. 2000 Revision).

[8]    Trazodone is used to treat depression. Trazodone is in a class of medications called serotonin modulators.  See www.nlm.nih.gov/medlineplus/druginfo.

memory and insight, stable mood and affect, stable concentration and orientation, good and stable perceptual difficulties, and good judgment. (Tr. 259). Plaintiff's depression was noted as much improved, and her medications were continued. (Tr. 259).

On December 6, 2005, plaintiff was evaluated by Carol Leinonen, Psy.D. in connection with her application for benefits. (Tr. 270-271). Dr. Leinonen stated that plaintiff had difficulties describing any concerns regarding her disability. (Tr. 270). Plaintiff also denied current symptoms of depression, anxiety, behavioral or social problems, and denied problems of energy levels, motivational or lack of interest and pleasure in daily activities. (Tr. 270). Plaintiff reported she was getting along fine at school, and denied problems with concentration, attention, distraction, appetite and diet. (Tr. 270). She did report mild sleep disturbances. (Tr. 270). Plaintiff denied prior treatment for depression or anxiety, and reported that she was not taking any medications. (Tr. 270).

Regarding her daily functioning, plaintiff reported to Dr. Leinonen that she was up at 7:15 a.m. on her own, and that she showered and got ready for school and was picked up at 8:30 by her bus. (Tr. 270). In addition to going to school, plaintiff had two volunteer positions. (Tr. 270). When she returned home, plaintiff watched TV, did chores, called friends to talk, and helped with cooking. (Tr. 270). At night, she watched TV or walked to the community center to work out; she was able to go on errands and had a checking account. (Tr. 270).

Regarding plaintiff's mental status examination and behaviors, Dr. Leinonen stated that plaintiff arrived for her appointment appropriately groomed. (Tr. 270). She had some difficulty answering questions and provided very little information. (Tr. 271).

Her speech was relevant, coherent and normal but rather slow at times; her motor activity level was slow; her attention span and eye contact were adequate; and her mood was normal with blunted affect. (Tr. 271). Plaintiff's long- and short-term memory appeared somewhat impaired. (Tr. 271). Her general knowledge, ability to abstract and social judgment were significantly below average. (Tr. 271).

Dr. Leinonen concluded that plaintiff was able to understand, retain and follow simple verbal directions, and was able to complete very simple mental tasks requiring minimal pace and persistence. (Tr. 271). Dr. Leinonen opined that plaintiff would likely have significant problems with more complex or demanding directions and tasks, her social skills were impaired with very minimal engagement, and her ability to tolerate stress was commensurate with her intellectual functioning. (Tr. 271). Dr. Leinonen also found that plaintiff was likely to need assistance with managing funds. (Tr. 271).

Dr. Leinonen determined plaintiff's DSM-IV diagnosis as follows:

Axis I:        Major depressive disorder – in remission

Axis II:       Mild mental retardation

Axis III:      Deferred to physician

Axis IV:       Mild

Axis V:        Current GAF: 70

(Tr. 271).

On December 27, 2005, Dr. Konke performed a Psychiatric Review and Mental Residual Functional Capacity Assessment. (Tr. 272-290). Dr. Konke found that plaintiff had perceptual or thinking disturbances, and the medically determinable impairment of mild mental retardation, with an IQ of 71-86. (Tr. 273). Plaintiff also exhibited

decreased energy and difficulty concentrating or thinking, and the impairment of major depressive disorder in remission. (Tr. 275). For functional limitations within the B criteria of the listings, plaintiff was determined to have a moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (Tr. 282).

As for the mental residual functional capacity assessment, Dr. Konke indicated plaintiff was not significantly limited in her ability to remember locations and work-like procedures, her ability to understand and remember very short and simple instructions, her ability to carry out very short and simple instructions, her ability to work in coordination with or proximity to others without being distracted by them, and her ability to make simple work-related decisions. (Tr. 286). Plaintiff was found to be moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to interact appropriate with the general public, and to respond appropriately to changes in the work setting. (Tr. 286-287). Plaintiff was not significantly limited in her ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use

public transportation, or to set realistic goals or make plans independently of others. (Tr. 287).

Based on this information, Dr. Konke concluded that plaintiff retained the ability to understand simple instructions, could sustain performance of simple tasks, could tolerate brief and superficial interaction, would do best without public contact, and could tolerate routine changes in the work environment.  (Tr. 288).

### C.    Educational, Vocational, and Residential Service Records

#### 1.    School Records

On April 30, 2003, plaintiff was re-evaluated by the Minnesota River Valley Special Education Cooperative.[9]  (Tr. 222).  The evaluator noted that plaintiff scored far below average in reading, writing, and math skills.  (Tr. 222-223).  Plaintiff had difficulty getting her ideas across because of her limited vocabulary and because she spoke quietly.  (Tr. 223).  She got along well with her peers and teachers, and was noted to be easily influenced by others and vulnerable because of her lack of assertiveness and poor problem solving skills.  (Tr. 223).  Plaintiff was interested in child care; she had done some babysitting, but had never had a job.  (Tr. 223).  Her teachers and social worker felt she would need a lot of support to be successful on the job, and her disability made job shadowing important.   (Tr. 223).   Plaintiff was administered the Enderle-Severson evaluation, which determined that it would be hard for her to be aware of safety concerns and to solve the challenges of everyday life, she was extremely limited in her knowledge of community resources, and her disability seemed to limit her

---

[9]    According to the report, plaintiff had been last assessed in April or May 2000, at which time she was determined to qualify for services under the DCD (believed to refer to Developmental Cognitive Disability) criteria.  (Tr. 222).

knowledge of positive options for recreation.  (Tr. 224).  Plaintiff's social worker felt that plaintiff had very few self-advocacy skills, and her teachers noted that she was a passive learner who asked few questions, relied heavily on other students for help, and pretended she understood more than she actually did.  (Tr. 224).  Plaintiff needed to learn life skills such as handling a budget, paying bills and shopping for food, job skills with a job shadowing component, assertiveness skills and positive ways to use recreation and leisure.  (Tr. 224).  Plaintiff met the components of Mild-Moderate of the Minnesota criteria for Developmental Cognitive Disability.  (Tr. 224).

On November 2, 2003, when plaintiff was in grade 11, she had an Individualized Education Program (IEP) completed by the Minnesota River Valley Special Education Cooperative.  (Tr. 64).  Her primary disability was DCD Mild Moderate.  In the area of employment, plaintiff stated her goal was to graduate and then go to school so she could work at a daycare center or have her own daycare.  (Tr. 66).  Plaintiff indicated that she needed to work on reading, writing and math skills, and needed to learn about jobs and job skills.  (Tr. 66).  Under short-term objectives in the area of employment, plaintiff was to gain work experience in a variety of settings, demonstrate the skills necessary to gain paid employment, read a payroll check and work schedule accurately, and identify an area of interest to pursue vocationally.  (Tr. 66).  In the area of community participation, plaintiff indicated a desire to learn more about cooking, getting her drivers license, and learn how to solve problems and stand up for herself.  (Tr. 67).  Plaintiff's primary needs were related to developing and applying skills to be successful in adult roles, and to gain more knowledge and life skills along with continuance of exposure and life experience, to gain a better understanding of working and living on

her own.  (Tr. 68).  A school-based program with special education support in classes was considered but determined not be relevant to plaintiff's immediate need for special education instruction in transition area.  (Tr. 68).

On September 10, 2004, a Teacher Questionnaire was completed by Jodi Sorenson, a school social worker.  (Tr. 73).  On the dimension of acquiring and using information, plaintiff was rated as having a slight problem comprehending oral instructions, recalling and applying previously learned material, and applying problem-solving skills in class discussions.  (Tr. 74).  Sorenson rated plaintiff as having an "obvious problem" understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, and learning new material. (Tr. 74). Sorenson observed that when plaintiff was confused she would fake understanding.  (Tr. 74).

On the dimension of attending and completing tasks, plaintiff had "no problem" paying attention when spoken to directly, sustaining attention during play and sports activities, focusing long enough to finish assigned activity or task, carrying out single-step instructions, waiting to take turns, organizing her own things or school materials, completing class and homework assignments, and working without districting herself or others.  (Tr. 75).  Plaintiff had a "slight problem" refocusing to task when necessary, changing from one activity to another without being disruptive, completing work accurately without careless mistakes, and working at a reasonable pace and finishing on time.  (Tr. 75).  Plaintiff had an "obvious problem" carrying out multi-step instructions.

(Tr. 75).  Plaintiff received prompts to assist in initiating and completing tasks and occasionally struggled even with the prompts.  (Tr. 75).

Regarding interacting and relating with others, plaintiff had "no problem" playing cooperatively with other children, asking permission appropriately, and taking turns in a conversation.  (Tr. 76).  Plaintiff had a "slight problem" following rules.  (Tr. 76).  Plaintiff had a "serious problem" seeking attention appropriately, and an "obvious problem" expressing anger appropriately, respecting adults in authority, using language appropriate to the situation and listener, and introducing and maintaining relevant and appropriate topics of conversation.  (Tr. 76).  Sorenson rated plaintiff as having a "very serious problem" making and keeping friends, relating experiences and telling stories, interpreting the meaning of facial expressions, body language, hints and sarcasm, and using adequate vocabulary and grammar to express thoughts in everyday conversation.  (Tr. 76).  Sorenson noted that plaintiff functioned at a developmental age that was much lower than peers her age, and that it was difficult for plaintiff to relate to conversation topics and participate age-appropriately.  (Tr. 76).  Sorenson also observed that plaintiff had difficulty maintaining relationships because she misconstrued interactions and needed assistance processing and understanding.  (Tr. 76).  Plaintiff had no problem moving about and identifying objects.  (Tr. 77).

As far as caring for herself, Sorenson stated that plaintiff had no problem taking care of personal hygiene or caring for her physical needs.  (Tr. 78).  Plaintiff had a "slight problem" knowing when to ask for help.  (Tr. 78).  Plaintiff had an "obvious problem" being patient when necessary, cooperating in taking needed medications, responding appropriately to changes in her own mood, and using appropriate coping

skills to meet the daily demands of the school environment. (Tr. 78). Sorenson rated plaintiff as having a "serious problem" handling frustration appropriately, and a "very serious problem" using good judgment regarding personal safety and dangerous circumstances, and identifying and appropriately asserting emotional needs. (Tr. 78). Sorenson observed that plaintiff required guidance to sudden mood changes and managing them because developmentally, she was not able to cope with some of the demands put on her age group, which affected her emotionally. (Tr. 78).

Regarding plaintiff's health, Sorenson noted that plaintiff was medicated at the time for depression and had a history of suicidal ideation. (Tr. 79).

## 2. Vocational Service Records

Between June 1, 2006 and July 31, 2007, plaintiff was served by Vocational Support Services ("VSS") to assist her in her employment efforts. (Tr. 180-221). On June 1, 2006, plaintiff met with Sarah Gutzman of Scott County Rehabilitative Services regarding an interview at AmericInn; plaintiff also checked to see if positions were available at Emma Krumbee's and the Lutheran Home. (Tr. 194). On June 7, 2006, plaintiff was to meet with Gutzman again but failed to show. (Tr. 194). On June 8, 2006, they met and filled out an application for a grocery store. (Tr. 194). On June 20, 2006, plaintiff failed to show at a meeting with Gutzman because she overslept. (Tr. 194). They met again on June 23, 2006 regarding possible jobs at Rainbow Daycare, KinderCare and North Aire Market. (Tr. 194). On June 26, 2006, plaintiff and Gutzman were to meet, but plaintiff got her days mixed up and they rescheduled. (Tr. 194). On July 6 and July 14, 2006, Gutzman met with plaintiff regarding job opportunities, applications and interviewing techniques; plaintiff had been getting up late and they

discussed plaintiff getting in the practice of waking up earlier so she is able to get to work. (Tr. 193).

On August 2, 2006, plaintiff began work at Lutheran Home as a dishwasher. (Tr. 148). On September 2, 2006, plaintiff's manager called VSS concerned because plaintiff was late for one shift and had called in sick for another. (Tr. 191). For the week ending September 9, 2006, VSS noted that plaintiff called in sick to work for one shift, and plaintiff's manager reported that he felt plaintiff was purposely working slowly because she got assistance from co-workers as a result. (Tr. 191). VSS and plaintiff's manager met with plaintiff on September 16, 2006 to discuss plaintiff's attendance at work. (Tr. 190). Plaintiff did not show for her shifts at work on September 19, 22 and 23, and was fired by her manager. (Tr. 190). VSS began a placement process, but on September 28, 2006 plaintiff missed a scheduled meeting with VSS and did not answer her door or return phone calls. (Tr. 190). Later in the week of October 7, 2006, plaintiff called VSS staff and stated that she really did want to find a job. (Tr. 190). Plaintiff did not want to meet with VSS during the week of October 14, 2006 because she had too much going on. (Tr. 189).

In January of 2007, VSS secured a volunteer position for plaintiff at the Lutheran Thrift Store in Belle Plaine, Minnesota. (Tr. 181, 184, 219). On her first day, plaintiff failed to report for work and stated that she had a family emergency; VSS later found out that plaintiff had spent the day with a friend. (Tr. 184). VSS immediately addressed attendance issues with plaintiff and stressed the importance of reporting to work when scheduled. (Tr. 181, 185). There was one other occasion where plaintiff did not report to work for two days, and VSS addressed the issue again. (Tr. 185). Plaintiff did better

with her attendance. (Tr. 181). VSS also continued to try to obtain a position for plaintiff, focusing on daycares because plaintiff liked to work at daycares. (Tr. 219). The week ending February 3, 2007, plaintiff missed two days of volunteering. (Tr. 219). The next couple of weeks VSS noted plaintiff was doing well going to work, and that she was showing more responsibility. (Tr. 220). Plaintiff missed work on March 16, 2007 and was only showed up at work for 1-2 times per week out of three scheduled times; however, VSS noted that she was doing much better calling her rides and her supervisor. (Tr. 220). VSS also noted that her attendance had to become much better because no job would allow her to be as absent as she was. (Tr. 220). The week ending April 21, 2007, plaintiff made it to the Thrift Store three days out of three. (Tr. 220). VSS stated that plaintiff was doing a great job when she showed up for work, but also noted that she was missing a lot of volunteer work. (Tr. 220-221). Plaintiff's brother became ill, and VSS told plaintiff that was a legitimate reason for missing work. (Tr. 221). Through June of 2007, VSS continued to try to place plaintiff with a job. (Tr. 221).

Cheryl Gerold, employment counselor at VSS, authored a report dated February 21, 2007. (Tr. 184). She stated that VSS was still concerned about plaintiff's attendance, but noted that plaintiff's attendance had improved at the Thrift Store and that plaintiff did a good job and appeared to enjoy her time there. (Tr. 185). Gerold stated that plaintiff had the potential to be successful in a work setting, and hoped that the volunteer position would provide plaintiff with the opportunity to develop good work habits. (Tr. 185).

### 3. **Residential Service Records**

Plaintiff was assisted by Designing Dreams in her various day-to-day needs such as financial management, transportation, proper nutrition, social activities, and medical care. (Tr. 124-152). In plaintiff's annual progress review for May of 2006 through April 2007, it was observed that plaintiff had sufficient money to pay her bills and she paid them on time, and the goals with respect to use of the bus and engagement in social activities had been discontinued. (Tr. 132-33). As to meal planning and preparation, plaintiff was making a variety of meals from scratch. (Tr. 135). With respect to her ability to assess when she was ill, by the fourth quarter plaintiff had a general sense of what to do when she was ill and was appropriately going to the doctor without staff assistance. (Tr. 135). At the same time, it was also noted that she did not always follow through with her medication. (Tr. 135).

On the topic of behavioral and emotional health, the review indicated in July of 2006 plaintiff was taken to the emergency room after reporting to a friend that she had been drinking all day and taken about six tablets of Tylenol. (Tr. 137). For the second quarter of the reported year, plaintiff had been canceling on staff more and was trying an antidepressant. (Tr. 137). For the third quarter, staff observed that plaintiff had not been consistent in taking her Celexa,[10] even with using a pill box, staff prompting and a chart. (Tr. 137). In addition, she had not been going to her volunteer job consistently and went through a week of avoiding staff phone calls. (Tr. 137). In the fourth quarter,

---

[10] Celexa (citalopram) is used to treat depression. Citalopram is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs). See www.nlm.nih.gov/medlineplus/druginfo.

it was noted that plaintiff had been not showing up or canceling on staff more, and that it occurred about six times in a two-week period. (Tr. 137).

On May 1, 2007, Jane Stroebel, Director of Designing Dreams completed an Outcome Support Plan for plaintiff. (Tr. 124-31). Stroebel indicated that plaintiff wanted to be involved in more activities and maintain a well-paying job. (Tr. 124). Stroebel noted that plaintiff had a history of depression, had taken herself off medication without discussion with anyone, but was now seeing her primary physician for depression management. (Tr. 124). Regarding food and cooking, Stroebel stated that plaintiff could prepare simple meals, needed assistance planning balanced meals, and may need help shopping, measuring items and cutting up items. (Tr. 124). On the topic of communication, Stroebel indicated that staff needed to make sure that plaintiff understood what was being said, that she liked tasks broken down, she needed additional processing time, she had difficulty getting her ideas across, and she had difficulty with tasks involving memory and concentration. (Tr. 125). Stroebel stated that school reports suggest plaintiff may pretend to understand more than she does. (Tr. 124). With respect to finances, plaintiff was able to balance her checking account, and independently use an ATM card. (Tr. 125).

The Outcome Support Plan for plaintiff created by Designing Dreams noted that plaintiff had a tendency to stay home from work when she was tired or feeling slightly ill, and that staff needed to encourage her to have good work attendance. (Tr. 124). The plan also listed goals for plaintiff: planning a menu; preparing a healthy meal four times per week; meet with staff when scheduled 90% of the time and give 24 hours notice

before canceling meetings with staff; and do gross motor activities and therapy exercises. (Tr. 125).

Stroebel also completed a Risk Management Assessment and Plan for plaintiff in April and May 2007. (Tr. 195-216). The April Plan indicated that plaintiff did not present a risk in any areas of physical limitation, but that she did present a risk in some personal areas, such as her ability to seek assistance because she was shy and quiet, and her mental condition affecting judgment due to her mild cognitive impairment. (Tr. 207, 209-210). The Plan also stated that plaintiff would present a risk managing her own finances, and identified plaintiff as an individual needing a 24-hour plan of care, which was defined as not requiring supervision at all times but having someone assigned that was responsible and accessible to plaintiff in case of emergency. (Tr. 215-216). The May Plan did not materially differ from the April 2007 plan. (Tr. 195-205).

On May 1, 2007, Scott County Community Services completed an Individual Service Plan (ISP) for plaintiff. (Tr. 158-179). The ISP summarized Dr. Mavis's intellectual functioning evaluation and functional skill/adaptive behavior evaluation. (Tr. 163). The ISP stated that plaintiff had began taking anti-depressant again, which had helped considerably, and that plaintiff needed reminders to take it on a daily basis because in the past she had stopped taking an anti-depressant without telling anyone. (Tr. 164). Plaintiff's current functioning was assessed, and stated that plaintiff needed assistance in meeting basic needs such as assuring shelter and adequate food, and in managing finances. (Tr. 165-166). Plaintiff also needed assistance making and attending medical appointments and cooperating with medical procedures and treatments. (Tr. 165-166). Plaintiff was evaluated as being independent in such self-

care skills as bathing, grooming and hygiene, dressing, dental hygiene and eating, and in household management skills such as housekeeping, laundry, clothing care, meal preparation, and following daily routine. (Tr. 169-170). However, she needed verbal and physical assistance with budgeting and paying bills. (Tr. 170). Plaintiff's communication skills were evaluated; the ISP stated that plaintiff's expressive language was functional and that she comprehended verbal communication, but she needed additional processing time, she had simple vocabulary, and her non-verbal abilities were a relative strength compared to her verbal reasoning and language ability. (Tr. 171). The ISP stated that plaintiff would have difficulty with tasks involving memory and concentration. (Tr. 171). As to plaintiff's social skills, the ISP stated that she go along well with peers and adults. (Tr. 173). Regarding plaintiff's vocational skills, the ISP remarked that plaintiff volunteered at the Lutheran Home Thrift Store tagging and pricing clothing for two hours a day, three days per week, but that she needed much encouragement to attend the position. (Tr. 174). The ISP noted that plaintiff was working on getting a good job reference for a future job, and referenced her previous job at the Lutheran Home which she had quit because she had difficulty getting to work and on time, as well as a janitorial position through her school. (Tr. 174-175). Long range, plaintiff wanted to find a job that would provide her with an income so she could have more freedom with her spending. (Tr. 175).

### D.    Activities of Daily Living

On November 22, 2005, plaintiff completed a functioning report in support of her application for benefits. (Tr. 97-104). She described her daily activities as getting ready to go to school, cleaning the house a little bit when she returned home, eating dinner,

watching television and going to bed. (Tr. 97). She stated that she had no problems with personal care, and that her conditions did not affect her sleep. (Tr. 98). She also stated that she did not need help taking medicine. (Tr. 99). Plaintiff prepared her own meals, and performed household chores such as vacuuming, sweeping, mopping, dusting and laundry. (Tr. 99). She traveled by walking, riding in a car, and using public transportation. (Tr. 100). Plaintiff shopped for clothes and personal needs. (Tr. 100).

Plaintiff indicated that she could not pay bills or handle a savings account, but she could count change and use a checkbook. (Tr. 100). Her hobbies were reading and bowling. (Tr. 101). Socially, she went out with friends and spoke with them on the phone, and went to a community center on a regular basis. (Tr. 101). Plaintiff stated that her conditions affected her understanding, but that she followed written instructions pretty well, and followed spoken instructions well. (Tr. 102). She got along well with authority figures, handled stress and changes in routine well. (Tr. 103).

On November 23, 2005, a third-party functioning report was completed by Sheri Witt, plaintiff's foster provider at the time in support of plaintiff's application for benefits. (Tr. 105-112). Witt stated she had known plaintiff since August 2004. (Tr. 105). Witt described plaintiff's daily activities as getting ready for school, taking the bus to school, doing schoolwork, job-work for two hours per week and volunteering, and then returning home. (Tr. 105). Most evenings plaintiff sat on the couch and watched television unless prompted to do activities, such as helping with cooking or cleaning. (Tr. 105). According to Witt, plaintiff claimed to have trouble sleeping sometimes. (Tr. 106). Plaintiff had no problem with personal care, although at times she chose inappropriate things to wear. (Tr. 106). Plaintiff sometimes required a simple verbal prompt on the

weekends to take care of her personal needs and grooming, and needed verbal reminders occasionally to take or refill her medication.  (Tr. 107).  Plaintiff could prepare some meals, but was not very skilled in understanding cooking directions, timing and measurements and was very easily confused.  (Tr. 107).  It took plaintiff about two to three times longer to prepare the meals.  (Tr. 107).

Regarding household chores, Witt stated that plaintiff did dishes, swept, mopped, did her laundry and once helped with the leaves outside.  (Tr. 107).  She sometimes needed verbal reminders to do the chores or instructions while helping to clean.  (Tr. 107).  Plaintiff walked, rode in a car and used public transportation to get around, and was allowed to go out alone for one to two hours when given exact plans and it was daylight outside.  (Tr. 108).

According to Witt, plaintiff shopped in stores for personal needs items and clothes twice a month and took longer to try on clothes.  (Tr. 108).  Plaintiff was able to pay bills, count change, handle a savings account and use a checkbook.  (Tr. 108).  For hobbies, plaintiff watched television and talked on the phone.  (Tr. 109).

Socially, Witt indicated that plaintiff talked on the phone but did not spend much time with others besides Witt.  (Tr. 109).  Plaintiff went to the community center once a month to work out.  (Tr. 109).  Plaintiff needed to be reminded to go to the pharmacy to fill her prescription once per month.  (Tr. 109).  Plaintiff did not have issues getting along with others, but sometimes said rude and inappropriate things to people.  (Tr. 110).

Witt indicated that plaintiff's conditions affected her memory, completing tasks, concentration, understanding, following instructions, using hands and getting along with others.  (Tr. 110).  Witt stated that plaintiff has a hard time understanding and following

directions; she forgot things because of lack of concentration and consequently did not complete some tasks. (Tr. 110). Plaintiff was awkward at times and her poor social skills limited her ability to make friends. (Tr. 110). Plaintiff finished what she started, but she could not pay attention to things that required concentration for very long. Plaintiff had trouble understanding written instructions, she could follow spoken instructions, although she needed verbal cues at times. (Tr. 110). Plaintiff got along with authority figures, but had an attitude quite often. (Tr. 111). Plaintiff was below average at handling stress, and did not like changes in routine. (Tr. 111).

In summary, Witt stated that plaintiff needed constant verbal reminders to make plans with friends and that plaintiff chose not to call people and invite them to do things. (Tr. 112). Plaintiff would go with friends if invited, but her friends were limited due to plaintiff's lack of social skills. (Tr. 112). Plaintiff also needed continual verbal prompts and sometimes assistance in setting up appointments, had boundary issues with men, and was not very assertive. (Tr. 112).

### E.    Plaintiff's Hearing Testimony

On July 18, 2007, plaintiff appeared and testified at the hearing before the ALJ as follows: She supported herself by using food stamps and General Assistance. (Tr. 304). She had been looking for some jobs and volunteered at a thrift store in Belle Plaine, Minnesota. (Tr. 305). Plaintiff finished high school, taking special education classes for most of her subjects. (Tr. 306-307). When asked what about her medical or mental conditions would prevent her from doing a full-time job, plaintiff responded that she did not think there was anything. (Tr. 307). She stated that the problem with getting a job was that she was having "no luck." (Tr. 307).

Plaintiff testified that she got along with people and had friends she met with and saw regularly. (Tr. 307). She liked to read books three times a week and got them at the library. (Tr. 308). Plaintiff either walked or took public transportation when she needed to get somewhere. (Tr. 308). Plaintiff stated that her physical health was okay, and that she took Celexa and birth control. (Tr. 308-309).

Plaintiff stated that she quit her position at the Lutheran Home. (Tr. 309). When asked why, she stated that she was not feeling good. (Tr. 309). The ALJ asked plaintiff if she had the job now, whether she be able to do it or would she be calling in sick, and plaintiff responded that she would be able to do it. (Tr. 310). Plaintiff stated that she was able to fill out applications and go to interviews, and that she had been developing some interviewing skills with the people at Scott County and Designing Dreams. (Tr. 310).

When plaintiff was in high school, she was involved in a school program where she was placed in a work setting. (Tr. 313). She did the program for two years and worked at Northgate, an office building, where she vacuumed and cleaned bathrooms for approximately two to three hours per week under supervision. (Tr. 314-315). She had a schedule and people checked her work to make sure she was getting it done correctly. (Tr. 315). Plaintiff stated she had no trouble doing that work. (Tr. 315). Plaintiff also worked helping kids as a volunteer. (Tr. 316).

Plaintiff obtained the Lutheran Home job on her own; someone told her about it and she applied. (Tr. 317). When plaintiff worked at the Lutheran Home as a dishwasher, a Vocational Support Services person checked on her work and gave her tips on what to do. (Tr. 317-318). Plaintiff ran the dishwasher machine by herself. (Tr.

318).  She received training in how to use the machine and did not have any troubles with it after she started her job.  (Tr. 318).  Plaintiff quit the position because the Lutheran Home was on the verge of firing her due to the fact that she called in sick fairly often.  (Tr. 319).  Plaintiff tried to keep her job by picking up her pace because they told her she was moving at a slow pace.  (Tr. 319).  Plaintiff had been working approximately 15 to 20 hours per week.  (Tr. 320).

When plaintiff worked at Lutheran Home, she walked to work.  (Tr. 330).  She was able to take public transportation or a bus system.  (Tr. 330).  Scott County transit was available to her; she had to call and arrange a ride and pay money.  (Tr. 331).

Since quitting the Lutheran Home job, plaintiff testified she had one interview for a housekeeping position, but they had hired someone else.  (Tr. 320-321).  Plaintiff stated that the people at VSS did not make any suggestions to her about the way she applied for jobs or interviewed.  (Tr. 321).  They did suggest that she show up for work.  (Tr. 321).

Plaintiff now volunteers at the Thrift Store to give her something to do and give her job experience.  (Tr. 322).  VSS helped set up the volunteer position for her, and she had been doing it for three months, working about three days a week for two hours.  (Tr. 322).  She had some trouble missing work because her brother had cancer, which she stated was okay with the people at the thrift store.  (Tr. 323).

Plaintiff testified that she was previously seen by Scott County Mental Health and talked to a therapist or psychologist there a year-and-a-half to two years ago, but had not returned.  (Tr. 324).  There was no reason why she had not gone back to them.  (Tr.

324).  People had told her that she might benefit from therapy, and plaintiff felt that sometimes she needed help and sometimes she did not.  (Tr. 324-325).

Plaintiff took Celexa and people said she was happier.  (Tr. 325).  When she did not take medication, she got more depressed.  (Tr. 325).  Plaintiff sometimes had trouble sleeping; she did not fall asleep right away or woke up in the middle of the night three or four times each night.  (Tr. 326).

Plaintiff fixed her own food at home.  (Tr. 326).  Designing Dreams helped her with cooking, living skills, grocery shopping and meal planning.  (Tr. 327).  They also took her to the grocery store.  (Tr. 327-328).

Plaintiff talked to people in the building where she lived almost all the time.  (Tr. 328).  She maintained good contact with her family and saw or talked to someone from her family every weekend.  (Tr. 329).  In her spare time, she hung out with her friends and read.  (Tr. 329).  Her friends lived in the same building as her and she saw them three times per week.  (Tr. 329-330).

### G.    Testimony of Jane Stroebel

Jane Stroebel, Director of Services for Designing Dreams, also testified at the hearing before the ALJ.  (Tr. 331).  Designing Dreams was required by law to assess risks to plaintiff and developed risk management assessment plans.  (Tr. 334).  Stroebel stated that she coordinated plaintiff's services, put together risk management plans to minimize risk to plaintiff, and developed plans for teaching plaintiff skills and coordinating her medical care and finances.  (Tr. 332).  The primary role of Designing Dreams was for plaintiff's residential support, but they were also involved in assisting plaintiff with looking for employment.  (Tr. 334).  These services included calling around

to hotels to see who was hiring, helping plaintiff obtain and complete applications and setting up interviews.  (Tr. 335).  Stroebel testified that the reasons plaintiff stated that she did not show up for work are probably reasons that would not stop other people from going to work.  (Tr. 335).  Going to work was not always a priority for plaintiff and plaintiff had difficulty getting motivated to go to work.  (Tr. 336).  Plaintiff attended her volunteer position maybe fifty percent of the time.  (Tr. 336).  Stroebel was concerned about where plaintiff would end up without support and thought she needed support in every aspect of her life, including with her employment and residential needs.  (Tr. 336).  Without support, plaintiff would be easily influenced by others, as she did not always put her needs in front of others – for example, she would put family time before going to work.  (Tr. 336).

Plaintiff was in a foster home because her home environment was not conducive to her learning skills and being successful in life, and she was taking on the role of a caretaker in the home setting.  (Tr. 337).  Plaintiff also reported some physical abuse by a stepsister.  (Tr. 337).

Regarding plaintiff's needs for occupational functioning, Stroebel stated that plaintiff needed help breaking down tasks so that she did not get overwhelmed, support breaking down new tasks, and help primarily getting to work and communicating with managers about needing time off.  (Tr. 338).

According to Stroebel, plaintiff had fifteen hours of support a week in her home from Designing Dreams.  (Tr. 339).  This included working on healthy meal preparation, menu planning, grocery lists, cooking skills, physical therapy exercises for her back, losing weight, regular exercise, and taking her medication.  (Tr. 340).  Plaintiff had

problems with personal boundaries, and she received ongoing counseling for that. (Tr. 340). Plaintiff highly valued a male companion in her life and did not always make safe choices in that respect. (Tr. 340). Stroebel considered plaintiff vulnerable physically because she had gone off to the homes of people she did not know and stayed at their houses. (Tr. 342).

Plaintiff also had a history of not taking her medication regularly and had stopped taking Paxil on her own. (Tr. 342). Plaintiff was supposed to take Celexa every day, but did not do so on a regular basis. (Tr. 342). If plaintiff did not take her medication, she became tearful, slept more frequently, and got angry and defiant when assistance was offered. (Tr. 343). Plaintiff also had mood swings. (Tr. 343). It was Stroebel's opinion that plaintiff's mood was not an issue at the Thrift Store, but it was at the nursing home and was the reason plaintiff did not go to work some days. (Tr. 343). Plaintiff's mood swings were aggravated by her not taking her medication. (Tr. 343). Designing Dreams encouraged plaintiff to start talking to a counselor because plaintiff got very stressed about family issues, but plaintiff chose not to. (Tr. 344).

Stroebel saw more risk in plaintiff's functioning in society because she was easily influenced by others, but plaintiff also needed support at home as far as maintaining paperwork to keep her support. (Tr. 345). Stroebel though plaintiff would not maintain it because she did not prioritize things well. (Tr. 345).

Stroebel thought that the success plaintiff achieved with her janitorial job was because it was incorporated into the school day and there was a network set up around it. (Tr. 346). Now that plaintiff was on her own and had to get herself up, problems occurred. (Tr. 346). It did not appear to Stroebel as though plaintiff would be able to

maintain a work schedule, or get to and from work, or be productive in work without a supportive environment. (Tr. 346-347). Stroebel thought full-time work would be too much for plaintiff because she was having problems with even part-time employment. (Tr. 347).

Stroebel testified that plaintiff was supposed to have daily contact with Designing Dreams and would go for weeks or months without contacting them. (Tr. 347).

### H.     VE's Testimony

At the hearing, Vocational Expert ("VE") William Rutenbeck also testified. (Tr. 348). The ALJ presented the VE with the following hypothetical:

> Claimant is a younger person under the categories of the Social Security regulations, has a high school education in, in special education, no difficulties with communication. I'd like you to assume such an individual with the residual functional capacity for at least light work; subject to – able to understand and implement simple instructions and tasks, probably two-to-three step tasks at best; brief and superficial interaction with coworkers and the public; minimal changes in the work environment.

(Tr. 348).

The VE testified that there were unskilled jobs that fit the hypothetical. (Tr. 348). He excluded unskilled light jobs that involved public contact, such as cashiering, but for the type of job plaintiff had been looking for – a housekeeper or maid – he indicated that 11,000 of those jobs existed in the state. (Tr. 348-349). He also testified that plaintiff could perform light production assembly and packaging, and there existed 15,000 such jobs in the state. (Tr. 349). In terms of production, there were some minimal standards on pace and persistence. (Tr. 349).

If the person in the hypothetical had an RFC for medium-level work, a dishwasher or kitchen helper would fall within the hypothetical, and so would a janitorial

cleaning position. (Tr. 350). These positions, if full time, do have minimal expectations as to attendance, and getting to work on time. For unskilled work, the expectation was that the individual would not miss more than one or two days a month. (Tr. 351). If an individual was not able to meet that standard, the VE testified there would not be any work available under the hypothetical. (Tr. 351).

## VI.    DISCUSSION

Plaintiff contended that the record did not support the ALJ's determination of her residual functional capacity for two reasons: 1) he improperly placed great weight on the opinion of Dr. Leinonen, the medical consultant, in making his RFC determination, and 2) he did not adequately consider the non-medical evidence that plaintiff was not able to perform full-time employment, without frequent absences. Pl. Mem., p. 10.

In response, defendant argued that 1) plaintiff's admissions about her abilities and activities detracted from her allegations of disability and supported the ALJ's RFC determination; 2) the objective medical findings substantially supported the limitations assessed by the ALJ; 3) the ALJ properly considered the opinions of medical and non-medical sources when making the RFC determination; and 4) plaintiff's history of attendance problems at work did not warrant additional RFC restrictions. Def. Mem., p. 13-19.

In reply, plaintiff argued that her "clueless" admission at the hearing about her abilities to work should not detract from her allegation that she was disabled because she has a significant cognitive impairment and has little insight into her own limitations. Pl. Reply, p. 2. Plaintiff further contended that the objective medical findings did not support the ALJ's determination of RFC because few of these findings pertained to

plaintiff's limitations in the workplace, and the severity of plaintiff's functional limitations in the workplace did not become clearly evident until she began working in August 2006, which was some months after she was evaluated by Dr. Mavis and Dr. Leinonen. Id., pp. 3-4. Plaintiff reasserted her argument that the ALJ should not have placed great weight on Dr. Leinonen's opinion based on a single interview that was a year-and-a-half old by the time of the hearing. Id., p. 6. Finally, plaintiff dismissed defendant's argument that plaintiff's failure to go to work was not shown to be caused by her cognitive impairment or her diagnosis of depression because it was not a basis for the ALJ's decision in this case. Id., p. 7.

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. See Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003). However, it is the claimant's burden, not the Commissioner's, to prove the RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). The RFC determination must be supported by "medical evidence that addresses claimant's ability to function in the workplace[.]" Baldwin, 349 F.3d at 556 (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). However, the ALJ is not limited solely to consideration of medical evidence, "but is required to consider at least some supporting

evidence from a professional." Baldwin, 439 F.3d at 556 (citing 20 C.F.R. § 404.1545(c)).

## A. Weight Placed on the Opinion of the Medical Consultant

The ALJ stated that he "placed great weight on the consultative examination" performed by Dr. Leinonen in December 2005 as consistent with the plaintiff's overall level of functioning. (Tr. 21). In support of this determination, the ALJ stated that at the time of the examination, Dr. Leinonen indicated that plaintiff's depression was in remission, she appeared to be busy with daily activities including school, work and volunteer work, she was not experiencing problems with time management or mental overload, and Dr. Leinonen had found plaintiff's overall level of functioning to be consistent with a GAF of 70. (Tr. 21). The ALJ found that Dr. Leinonen's opinion (in addition to the opinions of the state examiners) was consistent with plaintiff's own admissions that she could work full time and that she was actively involved in a job search. (Tr. 22).

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir.1999) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991) and quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). See also Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998) ("A one-time evaluation by a non-treating psychologist is not entitled to controlling weight."). The Eighth Circuit has also stated:

> We have never held that the opinions of consulting physicians cannot constitute substantial evidence; indeed, such a holding would make the

> provisions allowing the Secretary to require claimants to submit to
> consultative exams, 20 C.F.R. §§ 404.1517-.1518, meaningless. Although
> we have stated that 'a treating physician's opinion is normally accorded a
> higher degree of deference than that of a consulting physician....' Thomas
> v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991), that does not mean a
> consulting physician's opinion can never constitute substantial evidence
> upon which a disability determination may rest.

Hight v. Shalala, 986 F.2d 1242, 1244 n.1 (8th Cir. 1993). See also Pletsch v. Astrue, 2009 WL 511409 at *24 (D.N.D. Feb. 27, 2009) ("It may be one thing to accord "great weight" to the opinions of the state-agency consultants in a particular case after having evaluated all of the evidence in accordance with 20 C.F.R. § 404.1527, but an entirely different thing to accord "great weight" to the opinions of the non-examining state-agency consultants simply on account of their status and without regard to the merits of the other medical evidence.").

Plaintiff argued that because the consult with Dr. Leinonen took place in December 2005 and was based on one meeting with plaintiff, her opinion should not be accorded great weight. Pl. Mem., p. 11. Furthermore, plaintiff contended that at the time of the evaluation, plaintiff was living in a foster home and was engaged in a supervised work program through her school, but since then, plaintiff had moved into her own apartment, had been helped in getting the dishwasher job and was terminated for poor attendance. Id.

As an initial matter, the Court notes that the record reflects that any treatment by a psychologist, psychiatrist or other mental health provider was limited to four visits in 2005 with Dr. Kennedy, all of which occurred prior to Dr. Leinonen's evaluation.[11]   In

---

[11]    Plaintiff's primary physician, Dr. Busch prescribed drugs to plaintiff for depression on July 29, 2004, (Tr. 231); at plaintiff's next visit with him on August 31, 2004, he indicated her depression was stable.  (Tr. 230).

fact, Dr. Leinonen's opinion is the most recent opinion in the record from a mental health provider who actually met with plaintiff in person. Thus, while Dr. Leinonen's evaluation took place a year-and-a-half before the hearing, the record does not reflect any subsequent medical change or deterioration in plaintiff's condition to suggest that Dr. Leinonen's opinion of plaintiff's limitations was no longer valid.

Further, the RFC determination by the ALJ with respect to the work-related effects of plaintiff's depression and cognitive difficulties was sufficiently supported by the medical evidence. The ALJ considered Dr. Leinonen's examination in which she assessed a major depressive disorder in remission and mild mental retardation. (Tr. 271). The record also indicates that Dr. Leinonen assigned plaintiff a Global Assessment of Functioning (GAF) score of 70, which indicates an individual who has some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functions pretty well, and has some meaningful interpersonal relationships. (Tr. 271).

Additionally, Dr. Leinonen opined that plaintiff was able to understand, retain and follow simple verbal directions, and able to complete very simple mental tasks requiring minimal pace and persistence. (Tr. 271). She also determined that plaintiff would have significant problems with more complex or demanding directions and tasks, and that her social skills were impaired with very minimal engagement. (Tr. 271).

The medical record does not contain substantial evidence contrary to Dr. Leinonen's opinion. Moreover, the ALJ did not discount the opinions of any treating physicians – i.e. opinions of Drs. Busch or Kennedy – in favor of Dr. Leinonen's opinion. In fact, Dr. Leinonen's opinion is not inconsistent with the earlier opinions of the other

psychologists in the record. Dr. Mavis met with plaintiff twice, on December 22, 2004 and again on January 14, 2005. (Tr. 263). Dr. Mavis indicated that plaintiff met the criteria for a diagnosis of Mild Mental Retardation, determined that plaintiff's depressive disorder was recurrent and moderate, and assigned plaintiff a GAF score of 55. (Tr. 266). Dr. Mavis also noted that plaintiff would have more difficulty with tasks involving memory and concentration. (Tr. 265).

Likewise, the treatment notes of Dr. Kennedy from February 3, 2005 through May 31, 2005, indicated that plaintiff's mood and depression were improved, even noting that depression was "much improved" on May 31, 2005. (Tr. 259-262). Plaintiff acknowledged to Dr. Kennedy that she was happier and feeling better. (Tr. 260, 261). Dr. Kennedy further opined that plaintiff had fair coping skills and fairly good concentration (Tr. 262); had good hygiene, fairly good memory and insight, better concentration, orientation and judgment, and no perceptual difficulties. (Tr. 259-261).

Additionally, a disability consultant, Dr. Konke, determined based on a review of her medical records that plaintiff was not significantly limited in her ability to ask simple questions or request assistance, or in her ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 286). Dr. Konke determined that plaintiff retained the ability to understand simple instructions, could sustain performance of simple tasks, and could tolerate routine changes in the work environment. (Tr. 288).

In light of the relative dearth of medical records in this case, the fact that Dr. Leinonen's opinion was the most recent opinion in the record from a mental health provider who actually saw plaintiff, and was not contradicted by those health

professionals who did treat or evaluate plaintiff or examine her records, the Court finds that the ALJ did not err in assigning great weight to Dr. Leinonen's opinion.

**B. Consideration of the Non-Medical Evidence**

Plaintiff asserted that the ALJ failed to give appropriate consideration to the non-medical evidence in the record that she could not perform full-time employment without frequent absences. Plaintiff's argument was comprised of two parts: first, the ALJ's reliance on plaintiff's own statements about her ability to work full-time was undercut by the observations of her school teachers in 2003 that she often pretended to understand things when in fact she did not, and by the fact that plaintiff had significant cognitive and developmental deficits; and second, the ALJ failed to credit the reports of VSS and Designing Dreams, which was inconsistent with SSA policy that requires he consider all available evidence. Pl. Mem., p. 14.

Regarding the first contention, the Court has difficulty with plaintiff's assertion that her own testimony should be discredited based on her condition. Failure to give some consideration to a claimant's subjective complaints is reversible error. Brand v. Secretary of the Dept. of Health, Educ. and Welfare, 623 F.2d 523, 525 (8th Cir. 1980). In this regard, the ALJ is required to take into account claimant's own descriptions of his or her limitations. See Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008) ("When determining [a claimant's] RFC, the ALJ was required to consider [the claimant's] own description of her pain and limitations.") (citing Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004)). Although there is a record of plaintiff's teachers observing in April of 2003 that plaintiff pretended to understand something when she did not (Tr. 224), there was no evidence presented to the ALJ that plaintiff's opinion of her ability to work

in July of 2007 was exaggerated. To the contrary, plaintiff's testimony was supported by the record. Plaintiff has been steadfast in her efforts to find work and in her expressed desire to work and earn money. For example, plaintiff indicated that she was interested in obtaining work in child care. (Tr. 223). Plaintiff enlisted the services of VSS to help her try to find work, and told Designing Dreams that she wanted to maintain a well-paying job. (Tr. 124). The ISP completed by Scott County in May 2007, shortly before the hearing, indicted that plaintiff wanted to find a job that would provide her with an income so she could have more freedom with her spending. (Tr. 175).

Additionally, plaintiff's activities of daily living were consistent with her testimony. On December 22, 2004 and January 14, 2005, Dr. Mavis observed that plaintiff's daily living skills were relatively high compared to her communication and socialization scores. (Tr. 265). In November 2005 plaintiff described her daily activities as getting ready to go to school, cleaning the house, watching television, that she prepared her own meals and performed chores such as vacuuming, sweeping, mopping, dusting and laundry; and that she shopped for her clothes and personal needs, and took public transportation. (Tr. 99-100). Plaintiff's foster provider also indicated in November 2005 that plaintiff watched television, helped with cooking and cleaning, and had no difficulty caring for her personal needs. (Tr. 106). Plaintiff told Dr. Leinonen in December of 2005 that she helped with cooking and performed household chores, talked to friends on the phone and watched television. (Tr. 270). These reports certainly provided the ALJ ample support to believe plaintiff's testimony that she could work full time. See e.g. Haley v. Massanari, 258 F. 3d 742, 748 (8th Cir. 2001) (finding inconsistencies between subjective complaints of pain and daily living patterns where claimant could care for

personal needs, wash dishes, change sheets, vacuum, wash cars, shop, cook, pay bills, drive, attend church, watch television, listen to the radio, visit friends and relatives, read and work on the construction of his home); Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) (finding that claimant's ability to cook some meals, water the flowers around his house, help his wife paint, watch television, go out for dinner, occasionally drive an automobile, and occasionally visit with friends, did not support a finding of total disability).

In summary, the ALJ was in the best position to evaluate the opinions of plaintiff's teachers from April of 2003 as a basis for discrediting plaintiff's testimony that she could work full time. "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007) (citing Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002)). See also Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) ("Where there are two inconsistent reports, with one supporting the ALJ's determination, this court must affirm the ALJ's denial of benefits. This court will not substitute its opinion for the ALJ's, who is in a better position to gauge credibility and resolve conflicts in evidence.").

Regarding plaintiff's argument that the ALJ did not credit the reports of VSS and Designing Dreams, the Court finds that the ALJ did in fact consider these reports, but determined that they were outweighed by the psychological reports and plaintiff's own testimony. (Tr. 22). The ALJ noted that plaintiff had hired VSS and secured a position at Lutheran Home that was terminated due to poor attendance issues. (Tr. 21). The ALJ observed that plaintiff had similar problems with attendance with her volunteer work at the Thrift Store, but that after she was confronted and educated on the importance of

her prompt attendance for work, she was able to improve her attendance. (Tr. 21). The ALJ stated that he "reviewed the opinion of Ms. Stroebel which appears consistent with the record and the findings of Vocational Support Services but is outweighed by psychological reports and the claimant's own testimony that she could perform full-time work. As noted by Stroebel, her primary role is to offer residential support." (Tr. 22). Furthermore, in the hypothetical presented to the VE, the ALJ did not reject the opinions reflected in the records from Designing Dreams and VSS. He assumed several of the limitations reflected in the reports of Stroebel, Designing Dreams and VSS such as the ability to understand and implement simple instructions and tasks, brief and superficial interaction with coworkers and the public and minimal changes in the work environment. (Tr. 348). As stated previously, the possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. <u>Culbertson</u>, 30 F.3d at 939.

Social Security Ruling 06-03p considers teachers and other educational personnel as "non-medical sources" who may have close contact with claimants and who may be "valuable sources of evidence for assessing impairment severity and functioning." Social Security Ruling 06-03p, 2006 WL 2329939, *3 (S.S.A. 2006). In this regard, the Social Security Administration recognizes that such sources often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." <u>Id</u>. However, while testimony of teachers can be used to contradict an opinion by an acceptable medical source, "only 'acceptable medical sources' can give us medical opinions." <u>Id</u>. at *2 (citing 20 CFR §§ 404.1513(a) and 416.913(a)). "Medical opinions

are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 CFR § 404.1527(a). Under 20 CFR § 404.1527(a), "'medical opinions' are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *2 (1996).

Here, the record contained very little in the way of medical opinions from plaintiff's own treating doctors. The ALJ relied upon the most recent medical opinion from a provider who had actually met with plaintiff, and accordingly, assigned it greater weight than the opinions of the non-medical providers in the record. In short, the ALJ found that the non-medical evidence was outweighed by the medical opinion and plaintiff's own statements about her abilities. The ALJ's decision is supported by the record, and the Court finds no basis for error.

## VII.    CONCLUSION

The Court concludes that the ALJ did not err in his decision to deny plaintiff's application for SSI benefits. The ALJ assigned appropriate weight to the opinion of Dr. Leinonen because it was the most recent and relevant psychological record in the medical record and because the opinion was consistent with substantial evidence in the record as a whole. Furthermore, the ALJ properly considered the opinions of the non-medical personnel in the record. For these reasons, the Court recommends that plaintiff's motion for summary judgment be denied and the Commissioner's motion for summary judgment be granted.

## RECOMMENDATION

For the reasons set forth above, it is recommended that:

1.       Plaintiff's Motion for Summary Judgment [Docket No. 8] be denied; and

2.       Defendant's Motion for Summary Judgment [Docket No. 14] be granted.


Dated:       August 10, 2009

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **August 27, 2009** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.